THE KING *vs.* HIRAM A. BRIDGES.

EXCEPTIONS TO RULINGS OF JUDD, C. J.

JULY TERM, 1885.

JUDD, C. J.; McCULLY and PRESTON, JJ.

When a person takes the life of another under the plea of self-defense it is for him to show the actual necessity for the act : that the person killed was in the act of committing some felony, or in the act of committing some grievous bodily harm upon the slayer under such circumstances as would induce a reasonable belief, from the manner of the assault and the weapon used, that the danger was imminent, and nothing short of taking the life of the aggressor would prevent it. No threats, no provocation by insulting language, gestures, or acts, unless accompanied by all the circumstances before mentioned, will justify or excuse the taking of human life.

It is proper to leave the whole case to the jury, with a statement of the law applicable.

A verdict of manslaughter in the second degree held fully justified by the evidence.

OPINION OF THE COURT, BY PRESTON, J.

THE defendant, Hiram A. Bridges, was indicted at the last January term of this Court for manslaughter in the first degree, by feloniously killing one Leonard R. Patten, on the 12th day of November, 1881, and was convicted of manslaughter in the second degree. The Chief Justice presided at the trial.

It appears from the evidence that at about 5 o'clock p. m. on the day in question the defendant was walking along Fort street, in this city, when Patten (the deceased) left some persons with whom he was talking outside Waterhouse's store and went into the store, from which he returned carrying a stick in his hand (described by witnesses to be about three feet long) and crossed over to the opposite side of the street and attacked the defendant, striking him several times about the head with the stick. The stick, which was of the kind used as a roller for piece goods, was broken by the force of the blows. The defendant, who had a loaded revolver

concealed about him, drew it and fired twice at the deceased, the second shot inflicting a mortal wound. The deceased was carried into a druggist's store near by and expired within a few minutes.

Evidence was given of improper relations having existed for some time between the deceased and the defendant's wife previous to her marriage with the defendant, which took place in the July preceding; and that the deceased had on several occasions been heard to say that he would shoot the defendant's wife, and that they (the defendant and his wife) should not leave the beach alive. These threats were not made in the hearing or presence of the defendant, but were communicated to him previous to the shooting.

The defendant testified : " The first threat was to the effect that we should not leave the beach alive. My wife told me this ; she also told me that Mrs. Horn (her mother) had told her that Patten had said he did not care for his life, but neither one of us should leave the country alive. These are the threats he made against me. These threats were brought home to me before the 12th November. From what I heard of these threats I thought that Patten would shoot me on the first opportunity. On Monday, the 10th, I was induced to carry my pistol in my pocket, believing he would kill me." Speaking of what occurred on the 12th, the defendant says : " When I heard the 5 o'clock whistle blow I walked up Fort street, on Ehler's side, toward home. When opposite to Williams' store, without any warning, I received a blow on the left side of the face and heard the words (an opprobrious epithet) 'I have got you now' ; at the same instant I received another blow just below the temple. In a dazed condition I started to run, when some one came up behind me and caught hold of my shoulder. I turned around and recognized Patten, his face white and his teeth showing. I felt for my weapon, and while drawing it he struck me again, saying 'Oh, you may shoot,' at the same time raising the stick ; while it was descending I pulled the trigger. In my excitement I may have pulled it twice. I felt him leave go of me and I ran up Fort street."

There is a slight discrepancy in the evidence of the various witnesses who saw the shooting—J. F. Noble, J. Williams, W. M. Gibson, F. H. Hayselden, H. Armitage, E. W. Jordan, J. M.

Starkey, J. S. Ginsburgh and W. Evans—as to the position of the parties at the time the shots were fired, and as to whether the first shot was fired before a blow was struck by the deceased, but the great preponderance of the evidence would seem to show that several blows were struck before the first shot was fired, and that when the second shot was fired the parties had separated a very little way and the stick was broken.

Counsel for the defendant requested the presiding judge to instruct the jury :

1st. That if the defendant heard and believed that Patten made threats against his life, or of severe bodily harm, he was justified in defending himself against the execution of such threats.

2d. That if the jury believe from the evidence that if Patten did make threats of severe bodily harm or of death against Bridges, that Bridges had reasonable ground to believe, and did believe, that such threats had been made, he was justified in using extreme measures for his self-defense, provided an attack was made on him by Patten.

3d. That if the jury believed from the evidence that at the time of the slaying some act was being done by Patten from which the defendant might reasonably infer that said Patten was about to carry out his previous threats made against defendant's life or person, he was justified in killing him, and the defendant must be acquitted.

4th. If the jury believe from the evidence that the killing of Patten was not excusable, and find that the defendant at the time was in a peculiarly nervous and excitable condition, they may return a verdict for a lower degree than that charged."

Which instructions were refused, but the instruction No. 3 was given, modified by the Court adding thereto the words : "But it must have been shown that Patten attacked him with a lethal weapon."

The defendant by his counsel excepted to said refusal to charge, and to said charge as modified.

The Court, in its charge to the jury, said :

"If you find that there is evidence to show that this homicide was premeditated by Bridges you cannot help finding him guilty as charged.

"A man must retreat, as far as he can safely, to avoid his assailant, and must flee as far as he can, and he may only kill his assailant when escape is no longer possible, as when he is penned in by a wall or a ditch. It is right for a man to defend his life, but he must make an honest attempt to get away, and he has no right to use fatal violence if he can escape.

"A man may not say 'I believed my life was in danger' in excuse for homicide. It is whether you gentlemen believe that a man of ordinary coolness was in imminent danger of his life, or of severe bodily injury, with no chance of escape. Would a reasonable man have believed his life in danger?

"It is not a case of necessity if any other means of preserving life remains. I am asked to charge you gentlemen, on behalf of the defendant, that if he had heard that Mr. Patten had made such threats as to put him in fear for his life, he was justified in defending himself in the manner he did. I decline to do so, as no threats will justify the taking of human life unless there be an attempt to execute them.

"You must take into consideration every part of the testimony as to what occurred the afternoon of the 12th of November, in what manner the defendant acted, how soon he turned around, and whether he could see what sort of weapon was used by Patten—was it a sort of weapon likely to put him in fear of his life? The stick has been shown and testified to. You see it was soft, the grain was not tough. If Mr. Bridges had an opportunity of getting away he should have availed himself of it, rather than killed Patten.

"I cannot rule as asked by the counsel for the defense, that if Bridges was satisfied that threats had been made against his life that you should acquit him. Mere threats of bodily harm do not justify violence.

"I am also asked to rule that if the defendant was in a nervous or excitable state when attacked that you should acquit him. That is not the law."

To such portions of the charge as above set out the defendant, by his counsel, excepted.

The jury found the prisoner guilty of manslaughter in the sec-

ond degree, to which verdict counsel for defendant excepted as being against the law and the evidence.

The Court, in addition to the various matters excepted to, instructed the jury that "to make a homicide excusable on the ground of self-defense the danger must be actual and urgent. No contingent necessity will avail; and when the pretended necessity consists of the as yet unexecuted machinations of another, the defendant is not allowed to justify himself by reason of their existence. The right of resorting to force, upon the principle of self-defense, does not arise while the apprehended mischief exists in machination only, nor does it continue so as to authorize violence by way of retaliation or revenge for a past injury. He must first retreat as far as he safely can to avoid the violence threatened by the party he is obliged to kill. The retreat must be with an honest intention to escape, and he must flee as far as he conveniently can by reason of some impediment, or as far as the fierceness of the assault will permit him, and then in his defense he may kill his adversary. This law is the best, the safest, the most conducive to morality, safety and protection of human life."

The Court also said: "There are three degrees of manslaughter. I do not agree with the counsel for the defense, that it is the province of the jury to weigh the consequences of the result of a conviction in the several degrees and apportion punishment in this case; that responsibility rests with the Court. You must find the degree from your estimate of the facts of the case."

We consider this last instruction to be correct, and that it covers the exception on this point.

The case of *Grainger vs. The State* (Tennessee), 5 Yerg., 459, cited by counsel for the defendant, has been frequently overruled, explained or disregarded.

In *Rippy vs. The State* (Tennessee), 2 Head., 117, Carruthers, J., in delivering the opinion of the Court, thus alludes to it: "The doctrine of the Grainger case, as explained by that of Copeland (7 Hump., 429), is undoubtedly the law. Yet no case has been more perverted and misapplied by advocates and juries."

We consider the contention made on behalf of the defendant, that he was in fear of his life, and was therefore authorized to

carry a loaded revolver for protection, and to use it as he did, is untenable.

It appears to us by his conduct he evinced no such fear, but armed himself for the purpose of shooting the deceased on the slightest provocation. Supposing a community to be without an authoritative police government, a person may be justified in sacrificing the life of another, actually seeking his life. But it is otherwise where there is opportunity to invoke the interposition of the law. A man who believes his life is in danger, but whose rights are not as yet attacked, ought, if he has access to a tribunal. clothed with the ordinary powers of a justice of the peace (which is the case in this Kingdom, Penal Code, Chap. 47), to apply to such tribunal to interfere. If he have ground enough to excuse him in killing the person from whom he believes himself in danger, he has ground enough to have that person bound over to keep the peace or committed in default of bail. Wharton's Criminal Law, Sec. 487.

The present is the first case of exactly this character in this Kingdom, and it becomes the duty of the Court to declare the law on the subject. The law has at all times been jealous of human life, and a person who slays another does so at his own peril, and must show matters in justification, excuse or mitigation to the satisfaction of the jury.

That eminent judge, Sir Michael Foster, states the law as follows: "Where a known felony is attempted upon the person, be it to rob or murder, here the party assaulted may repel force by force, and even his servant attendant upon him, or any other person present may interpose for preventing mischief, and if death ensueth the party so interposing will be justified. In this case nature and social duty co-operate." Fost. Cr. Law, p. 274.

Mr. East, 1 P. C., p. 271, states the law as follows: "A man may repel force by force in the defense of his person, habitation or property against one who manifestly intends or endeavors by violence or surprise to commit a known felony, such as murder, rape, robbery, arson, burglary, and the like, upon either. In these cases he is not obliged to retreat, but may pursue his adversary until he has secured himself from all danger; and if he kill him in so doing it is called justifiable homicide."

The killing is limited by the rule of necessity, upon which the right to kill in defense of person, habitation or property is universally placed, and such necessity is a question for the jury on the evidence.

"If a person is assaulted in such a manner as to put him in immediate and obvious danger of instant death or grievous bodily harm, he may defend himself on the spot and may kill or wound the person by whom he is assaulted.

"If a person is assaulted by another without any fault of his own with a deadly weapon, it is his duty to abstain from the intentional infliction of death or grievous bodily harm on the person assaulting until he (the person assaulted) has retreated as far as he can with safety to himself."

But this is always subject to the rule that he inflicts no greater injury in any case than he in good faith and on reasonable grounds believes necessary when he inflicts it. Stephens Cr. Law, Art. 200.

The principles here enunciated were recognized in the early history of this Court (1853) by Lee, C. J., in *Rex vs. Sherman*, 1 Hawn., 88.

Sherman was a gaoler and was called to a cell in the Fort to quell a disturbance, and he killed a prisoner named Burns, for which act he was indicted for murder. The prisoner contended that he was doing nothing more than a lawful act in quelling the disturbance, that he was in the strict path of duty, repelling force by force, and that even allowing he killed Burns, he did it in self-defense and the killing was justifiable homicide. The learned Chief Justice told the jury: "Where an officer is resisted he may repel force by force, and he will be justified in so doing, even if death should ensue; yet he ought not to come to extremities upon every slight interruption, nor without a reasonable necessity. If you find that Sherman used an undue degree of force in this case, that he dealt the blow when not acting in self-defense, it was a base and cowardly act, for which he should answer, and the least we can call it is murder in the second degree or manslaughter."

We have carefully considered the several requests as to instructions by the defendant's counsel and the exceptions to the rulings

59

given, and we are of opinion that no error was committed by the Court in refusing to charge the jury as requested by defendant's counsel, nor in the charge as given.

The instructions given, in our opinion, are in accordance with the law as recognized by the English and American authorities, and are substantially the same as have at all times been given and held proper by the judges in those countries, although in many cases they have been and are disregarded by juries, who it is well known often decide cases from motives of sympathy and with the idea that the defendants may be morally justified under the peculiar circumstances of each particular case, and with whose verdicts, when rendered in favor of the defendants, the courts cannot interfere.

But we hold the law to be that when a person takes the life of another under the plea of self-defense it is for him to show the actual necessity for the act: that the person killed was in the act of committing some felony, or in the act of committing grievous bodily harm upon the slayer under such circumstances as would induce a reasonable belief from the manner of the assault and the weapon used that the danger was imminent and nothing short of taking the life of the aggressor would prevent it. No threats, no provocation by insulting language, gestures or acts, unless accompanied by all the circumstances before mentioned, will justify or excuse the taking of human life.

And although in earlier times it was the custom of the Court to direct juries to find the facts specially and for the Court afterward to decide whether such facts were sufficient in law to justify or excuse the homicide, the modern, and indeed the universal, practice in the United States has been to leave the whole case to the jury, as was done in this case, with a statement of the law applicable, and for them to decide the matter.

In this case the jury, in their judgment—no doubt from, as they thought, some extenuating circumstances—found the defendant guilty of manslaughter in the second degree, thus mitigating the penalty prescribed for the offense as charged.

We agree with such verdict, and cannot say that it is against either the law or the evidence, but was fully justified by the evidence.

We think the whole of the exceptions should be overruled, and so order.

*Attorney-General Neumann,* for the Crown.

*W. R. Castle* and *Jona. Austin,* for defendant.

Honolulu, October 5, 1885.